2006 WY 13

**Jeannie COOK, Administrator of the Estate of Christina Proefrock, Deceased; and Randy Proefrock, Appellants (Plaintiffs),**

v.

**SHOSHONE FIRST BANK, a Wyoming corporation, Appellee (Defendant).**

No. 05–105.

Supreme Court of Wyoming.

Jan. 20, 2006.

Representing Appellants: Mark W. Gifford, Casper, Wyoming.

Representing Appellee: Scott E. Kolpitcke and Tracy J. Copenhaver of Copenhaver, Kath, Kitchen & Kolpitcke, LLC, Powell, Wyoming. Argument by Mr. Copenhaver.

Before HILL, C.J., and KITE, VOIGT and BURKE, JJ., and SKAVDAHL, DJ.

KITE, Justice.

[¶ 1] Christina Proefrock was employed as a teller at Shoshone First Bank (SFB). While she was away on vacation, SFB discovered $1,200 was missing from the bank. When Ms. Proefrock returned from vacation, SFB questioned her about the missing money. Ms. Proefrock denied any knowledge of the missing funds and SFB placed her on paid administrative leave while the matter

was investigated. A few hours later, Ms. Proefrock committed suicide.

[¶ 2] Ms. Proefrock's mother, Jeannie Cook, as administrator of her daughter's estate, and Randy Proefrock, Ms. Proefrock's husband, filed a complaint against SFB alleging claims for "liability in tort for [Ms.] Proefrock's suicide," negligent or intentional infliction of emotional distress, and punitive damages. In essence, they claimed SFB knew Ms. Proefrock did not take the money but falsely accused her and set her up to take the blame for it, which caused Ms. Proefrock such severe emotional distress that she took her own life.

[¶ 3] SFB filed a motion for summary judgment, claiming there were no genuine issues of material fact and judgment was warranted as a matter of law. The district court granted SFB's motion. We affirm.

## ISSUES

[¶ 4] The estate and Mr. Proefrock present the following issue:

Did the district court err when it granted summary judgment in favor of [a]ppellee, holding that the record is devoid of reasonable inferences to support [a]ppellants' legal theories?

SFB phrases the issue as:

Should the decision of the [d]istrict [c]ourt [j]udge granting summary judgment to [a]ppellee be affirmed for any of the reasons asserted by [a]ppellee in its Motion for Summary Judgment and [b]rief in support thereof?

## FACTS

[¶ 5] Viewed in the light most favorable to the estate and Mr. Proefrock, the evidence presented was as follows: In July 2001, Ms. Proefrock had been employed by SFB in Cody, Wyoming for less than a year and had worked at the Albertson's branch for only a few months. She was an at-will employee.

[¶ 6] On July 12, 2001, Ms. Proefrock completed her shift at 7:00 p.m. and left the bank to begin a ten-day vacation. She did not obtain written verification of the cash balance in her teller drawer from another SFB employee before leaving as was required by bank policy. While she was on vacation, another employee had the keys to her drawer and other employees used her password to sign into her teller drawer. Also while she was on vacation, SFB discovered that $900 in cash was missing from the vault and $300 was missing from Ms. Proefrock's cash drawer.

[¶ 7] On July 23, 2001, Ms. Proefrock returned to work following her vacation. She was confronted immediately by Graham Jackson, SFB vice president and cashier at the downtown bank, and Eric Wright, the assistant branch manager. Ms. Jackson accused her of stealing the money. She denied any knowledge of the missing funds. Ms. Jackson told Ms. Proefrock the bank would get the police involved and there would be lie detector tests. She also said there were hidden cameras in the bank about which the employees had no knowledge, a statement that was not true. Despite Ms. Proefrock's denial, Ms. Jackson placed her on paid administrative leave. Ms. Jackson did not tell Ms. Proefrock other employees were suspects in the theft.

[¶ 8] Ms. Proefrock left the bank and went to her apartment. She spoke with her husband, who came by the apartment, and her mother, brother and best friend. She told them SFB accused her of stealing money, she had not done it, but no one believed her. She received a telephone call from Ms. Jackson, asking her to prepare a written statement. Ms. Jackson went to Ms. Proefrock's home and retrieved the statement from her.

[¶ 9] Shortly thereafter, Ms. Proefrock ingested rubbing alcohol and shot herself in the head with her husband's .22 caliber pistol. Mr. Proefrock found her body a short time later. At the time of Ms. Proefrock's death, she had two children, ages 2½ and 1½.

[¶ 10] On June 2, 2003, the estate and Mr. Proefrock filed a complaint against SFB alleging that it knew or reasonably should have known at the time it accused Ms. Proefrock of taking the money that she did not

commit the theft.[1] The complaint further alleged that SFB knew the false accusation would cause Ms. Proefrock severe emotional distress and that SFB acted intentionally, recklessly and outrageously in falsely accusing her and inflicting severe emotional distress upon her, causing her to take her own life. The estate sought damages for unidentified potential claimants in the amount of Ms. Proefrock's future lost earnings, companionship, society and comfort. Mr. Proefrock sought damages for the emotional distress he suffered from finding his wife shortly after her suicide. The estate and Mr. Proefrock also sought punitive damages.

[¶ 11] Six months later, SFB filed a motion for summary judgment claiming it owed no duty to Ms. Proefrock, there was no evidence showing SFB's conduct caused Ms. Proefrock's suicide, there was no evidence SFB acted outrageously, intentionally or recklessly to cause Ms. Proefrock severe emotional distress and the claim was barred by worker's compensation. The estate and Mr. Proefrock filed a response in which they asserted genuine issues of material fact existed for trial concerning whether:

(1) SFB's false accusation of [Ms. Proefrock] was outrageous, and a willful departure from acceptable banking practices, and (2) SFB's false accusation induced in [Ms. Proefrock] a mental state that made it impossible for her to resist the impulse to end her own life, and was a substantial factor in [Ms. Proefrock]'s suicide.

The district court heard argument on the motion and, by order dated March 14, 2005, granted summary judgment in favor of SFB. In its order, the district court concluded:

[T]here are no genuine issues as to any material facts in this case and that Defendant is entitled to judgment as a matter of law and summary judgment should be granted to Defendant.

While the Plaintiffs have made numerous inferences and raised theories of conspiracy and cover-up, the Court finds that such inferences are not reasonable inferences that can be fairly drawn from the evidence or are otherwise supported by unwarranted and inadmissible speculation.

The estate and Mr. Proefrock appealed the order to this Court.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.R.C.P. 56(c). A genuine issue of material fact exists when a disputed fact, if proven, would establish or refute an essential element of a cause of action or a defense that a party has asserted.

We evaluate the propriety of a summary judgment by employing the same standards and by examining the same material as the district court. We examine *de novo* the record, in the light most favorable to the party opposing the motion, affording to that party the benefit of all favorable inferences that may be drawn from the record. If upon review of the record, doubt exists about the presence of issues of material fact, that doubt must be resolved against the party seeking summary judgment. We accord no deference to the district court's decisions on issues of law.

*Linton v. E.C. Cates Agency, Inc.*, 2005 WY 63, ¶¶ 6–7, 113 P.3d 26, 28 (Wyo.2005) (citations omitted).

[¶ 12] The standard of review is refined somewhat when applied to summary judgment in a negligence case.

"Summary judgment is not favored in a negligence action and is, therefore, subject to more exacting scrutiny. We have, however, affirmed summary judgment in negligence cases where the record failed to establish the existence of a genuine issue of material fact. See *Krier v. Safeway Stores 46, Inc.*, 943 P.2d 405 (Wyo.1997) (failure to establish duty); *Popejoy v. Steinle*, 820 P.2d 545 (Wyo.1991) (failure of proof of underlying claim of a joint venture); *MacKrell v. Bell H2S Safety*, 795 P.2d 776 (Wyo.1990) (failure of proof of

---

1. An amended complaint was filed on April 27, 2004.

defendant's duty); *DeWald v. State,* 719 P.2d 643 (Wyo.1986) (cause element was pure speculation); and *Fiedler v. Steger,* 713 P.2d 773 (Wyo.1986) (failure to establish cause in a medical malpractice action).

After a movant has adequately supported the motion for summary judgment, the opposing party must come forward with competent evidence admissible at trial showing there are genuine issues of material fact. The opposing party must affirmatively set forth material, specific facts in opposition to a motion for summary judgment, and cannot rely only upon allegations and pleadings . . ., and conclusory statements or mere opinions are insufficient to satisfy the opposing party's burden."

The evidence opposing a prima facie case on a motion for summary judgment "must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation." Speculation, conjecture, the suggestion of a possibility, guesses, or even probability, are insufficient to establish an issue of material fact.

*Jones v. Schabron,* 2005 WY 65, ¶¶ 9–11, 113 P.3d 34, 37 (Wyo.2005) (some citations omitted).

## DISCUSSION

### 1. Worker's Compensation Immunity

[¶ 13] As a preliminary matter, we address the fourth issue raised by the estate and Mr. Proefrock—whether SFB is immune from claims arising out of Ms. Proefrock's death by virtue of the Wyoming Worker's Compensation statutes, Wyo. Stat. Ann. § 27–14–101 *et seq.* (LexisNexis 2005). In addressing this issue, we note it is questionable whether the issue is properly before us. SFB raised the immunity claim in its summary judgment motion. In granting the motion, the district court did not rule on the claim. The estate and Mr. Proefrock resurrected the issue on appeal, claiming SFB is not immune. Despite the unusual manner in which the issue comes before us, we briefly address it.

[¶ 14] In its summary judgment brief, SFB claimed that it was immune from tort liability for Ms. Proefrock's death by virtue of the worker's compensation statutes. Citing *Baker v. Wendy's of Montana, Inc.,* 687 P.2d 885 (Wyo.1984), SFB argued that the estate and Mr. Proefrock were claiming essentially that SFB's actions created such unusual employment conditions that they caused Ms. Proefrock's death. Like the employee's injury in *Baker,* therefore, the bank argued, the injury here, Ms. Proefrock's death, was covered by worker's compensation and the tort claim was barred. Citing § 27–14–102(a)(xi)(G) and (J), the estate and Mr. Proefrock contended SFB was not immune because Ms. Proefrock suffered no compensable physical injury giving rise to a simultaneous or subsequent mental injury that caused her suicide.

[¶ 15] We hold the claim is not barred by worker's compensation. Section 27–14–102(a)(xi)(B) provides in pertinent part that the term "injury" does not include:

(B) Injury caused by:

. . .

(II) The employee's willful intention to injure or kill himself. . . .

To the extent Ms. Proefrock willfully intended to kill herself, this provision barred recovery under the worker's compensation statutes. Section 27–14–102(a)(xi)(J) further excludes coverage for:

Any mental injury unless it is caused by a compensable physical injury, it occurs subsequent to or simultaneously with, the physical injury and it is established by clear and convincing evidence. . . .

On the basis of this provision, we have held that where a claimant provides clear and convincing evidence that an employee's suicide or attempted suicide was the result of mental injury suffered subsequent to a compensable physical injury, the claim is covered by worker's compensation. *Brierley v. State ex rel. Wyo. Workers' Safety and Comp. Div.,* 2002 WY 121, ¶ 12, 52 P.3d 564, 569 (Wyo. 2002). Under the plain language of the statute, claims are not covered where the mental injury and resulting suicide were not caused by a compensable physical injury. There was no allegation Ms. Proefrock suffered a

compensable physical injury. Therefore, the claims arising out of her suicide were not covered.

### 2. Intentional Infliction of Emotional Distress

[¶ 16] The estate and Mr. Proefrock claim the district court improperly granted summary judgment on their intentional infliction of emotional distress claim. The gist of their claim was that SFB acted outrageously by accusing Ms. Proefrock of taking the money when it knew or should have known that she did not. Specifically, the complaint alleged SFB knew or should have known that: the cash balance in Ms. Proefrock's teller drawer was not verified when she left for vacation as required by SFB policies and procedures; another teller was in possession of the keys and had access to Ms. Proefrock's teller drawer while she was on vacation; other employees used Ms. Proefrock's password to sign into her teller drawer while she was on vacation; and accounting entries were made during Ms. Proefrock's absence which implicated others in the missing funds. The estate and Mr. Proefrock also claimed SFB acted outrageously by making material misrepresentations of fact when they accused Ms. Proefrock of theft, including that SFB had cameras of which employees were not aware; Ms. Proefrock was the only suspect; and, funds were in fact missing from the branch. They alleged SFB acted outrageously in failing to disclose to Ms. Proefrock that other employees were suspects in the theft and in accusing her, sending her home and requiring her to immediately submit a written statement for the police.

[¶ 17] SFB argues Ms. Proefrock's intentional and voluntary act in taking her own life was an intervening cause, which broke the chain of causation and precluded a finding of liability. SFB also asserts even if the chain of causation had not been broken, its actions in confronting Ms. Proefrock about the missing funds, placing her on paid administrative leave, and asking her to provide a written statement were not extreme and outrageous. Applying the rule that the court determines in the first instance whether conduct was extreme and outrageous, SFB asserts summary judgment was proper. SFB also contends the district court's order must be affirmed because there was no evidence SFB intended to cause harm to Ms. Proefrock and because a reasonable person would have had no way of knowing that confronting Ms. Proefrock and placing her on paid administrative leave would cause her to take her own life.

[¶ 18] In *Leithead v. American Colloid Co.*, 721 P.2d 1059, 1065 (Wyo.1986), this Court recognized a claim for intentional infliction of emotional distress as stated in the Restatement (Second) of Torts, § 46 (1965), which provides:

> "Outrageous Conduct Causing Severe Emotional Distress
>
> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

We adopted the definition of extreme and outrageous conduct found in comment "d" of the Restatement—conduct "which goes beyond all possible bounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community." *Leithead*, 721 P.2d at 1066. We also recognized the separate functions of the court and jury described in comment "h" of the Restatement:

> "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."

*Id.*

[¶ 19] Since *Leithead*, we have applied these principles with varying results in a number of employment cases. In three of those cases, we held the evidence established a genuine issue of material fact on the issue of outrageousness. *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211 (Wyo.

1994) (employer placed the employee on probation, cut his pay, altered his employment status, required him to publicly accept responsibility for the employer's financial problems, terminated him without conducting the audit that was promised and then publicly objected to his employment by other employers); *Kanzler v. Renner*, 937 P.2d 1337 (Wyo.1997) (repeated incidents in which employee was subjected by co-employee to being stared at, followed, subjected to sexually-motivated advances and physically intimidating behavior); *Worley v. Wyoming Bottling Co., Inc.*, 1 P.3d 615 (Wyo.2000) (repeated threats of termination, demands for impossibly large increases in sales, withholding pay raise, vilification for minor infractions despite stellar work performance, demotion and, finally, termination.) In two other employment cases, we held the evidence did not establish a genuine issue of material fact concerning outrageousness. *Terry v. Pioneer Press, Inc.*, 947 P.2d 273 (Wyo.1997) (summary judgment proper despite allegations of termination when superiors knew employee was vulnerable due to the death of a long-time friend; had a close personal relationship with one of his superiors; and his own son was hired to replace him); *Hoflund v. Airport Golf Club*, 2005 WY 17, 105 P.3d 1079 (Wyo.2005) (no competent evidence that termination was in retaliation for reporting sexual harassment.)

[¶ 20] We have also recognized the tort of intentional infliction of emotional distress in contexts other than termination cases. In *Bevan v. Fix*, 2002 WY 43, 42 P.3d 1013 (Wyo.2002), we reversed a district court ruling granting summary judgment on an intentional infliction of emotional distress claim in a case involving a domestic altercation. We held evidence showing the defendant beat, kicked, punched and choked the mother in the presence of her two children while screaming he wanted to kill her was sufficient to defeat summary judgment on the issue of outrageousness.

[¶ 21] Of the cases in which we have considered claims for intentional infliction of emotional distress, *R.D. v. W.H.*, 875 P.2d 26 (Wyo.1994) is most closely on point. In that case, the husband of a woman who committed suicide claimed her stepfather caused her death by sexually abusing her as a child and adolescent and providing her with the means to kill herself when he knew she was suicidal. We expressly recognized a claim for third party intentional infliction of emotional distress as described in § 46 of the Restatement (Second) of Torts:

> "(2) Where [extreme and outrageous] conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>
> (b) to any other person who is present at the time, if such distress results in bodily harm."

*R.D.*, 875 P.2d at 32.

In accordance with comment "l" of the Restatement, we also recognized a narrow exception to the language in § 46(2) requiring presence at the time of the outrageous conduct. In his complaint, the decedent's husband alleged the sexual abuse by her stepfather throughout her childhood, adolescence and early adulthood caused her psychiatric difficulties and to attempt suicide. In 1990, decedent borrowed a firearm from her stepfather and used it to attempt suicide. Five days later, decedent asked her stepfather to help her obtain a prescription for Elavil, a drug she previously used to attempt suicide. Her stepfather obtained the prescription for her. She ingested an overdose and died several days later. Although her husband and his minor child were not present when the alleged outrageous conduct occurred, we held the facts presented demanded special consideration. We said:

> [Husband] and the minor child were present in the immediate aftermath of the tragic results of [stepfather]'s outrageous conduct, and the suicide was the final result of a continuing course of conduct instigated by [stepfather]. Accordingly, [husband] sufficiently pleaded a cause of action for intentional infliction of emotional distress,

and his claim should not have been dismissed.

*R.D.,* 875 P.2d at 33–34.

[¶ 22] With this precedent in mind, we turn to consideration of the evidence presented. As the estate and Mr. Proefrock correctly point out, our first task is to determine whether SFB's conduct in accusing Ms. Proefrock of theft and sending her home was extreme and outrageous, that is, whether it went beyond all bounds of decency such that it could be regarded as atrocious and utterly intolerable in a civilized community. As mentioned above, this determination is for the court in the first instance; it is only where reasonable minds may differ as to whether conduct is sufficiently extreme and outrageous that the determination is for the jury. Applying this standard, we conclude summary judgment was proper.

[¶ 23] Viewed in the light most favorable to the estate and Mr. Proefrock, the evidence showed that upon discovering that $900 was missing from the vault at the Albertson's branch, Ms. Jackson asked Mr. Wright to audit each teller drawer. Initially, the audit revealed a $500 shortage in teller Katie Clucas's drawer. Ms. Jackson spoke with Ms. Clucas about the shortage in her drawer and the vault. Ms. Clucas denied any knowledge of the missing funds but, in reference to the shortage in her drawer, asked if the coin she had purchased from Ms. Proefrock had been counted in the audit. Ms. Jackson did not know but said she would ask Mr. Wright; meanwhile, Ms. Clucas was placed on paid administrative leave. She was told the bank would involve the police and that lie detector tests would be given. She was also asked to provide a written statement.

[¶ 24] After meeting with Ms. Clucas, Ms. Jackson informed Mr. Wright about the coin purchase Ms. Clucas mentioned. He recounted the drawer, this time including the coin, and determined rather than being short Ms. Clucas's drawer contained $136 more than it should have. There being no shortage in her drawer after all, Ms. Clucas was allowed to return to work the following day.

[¶ 25] In the meantime, Mr. Wright and another employee audited the other teller drawers at the Albertsons branch and found the $300 shortage in Ms. Proefrock's drawer. Mr. Wright informed Ms. Jackson of the $300 shortage and told her $100 was missing from three different bundles in Ms. Proefrock's drawer, similar to the way in which bills of different denominations had been removed from individual strapped bundles in the vault.

[¶ 26] When Mr. Wright's audit was completed, another SFB employee performed a second audit. On July 20, 2001, Ms. Jackson reported the results of the audits to the bank president. Together they decided Ms. Jackson should be at the branch bank with Mr. Wright to talk with Ms. Proefrock when she returned to work from vacation on Monday morning, July 23, 2001.

[¶ 27] As planned, Ms. Jackson arrived at the bank shortly after 8:00 a.m. on July 23. Ms. Proefrock arrived a few minutes later. According to Ms. Proefrock's family and friend, Ms. Jackson accused her of taking the money. Ms. Proefrock denied it. Ms. Jackson told her to go home—she would be on paid administrative leave until the matter was resolved. She told Ms. Proefrock there would be an investigation involving law enforcement, lie detector tests and a review of the security tapes. According to Mr. Wright, Ms. Jackson asked Ms. Proefrock several times if there was anything she wanted to tell them and told her there were cameras located in the branch bank about which the employees were not aware.

[¶ 28] After Ms. Proefrock left, Ms. Jackson called her to obtain the written statement. Ms. Proefrock said she would prepare one. Ms. Jackson drove to her apartment and obtained the statement.[2] Ms. Proefrock handed her the statement through the partially opened door.

[¶ 29] Sometime that morning, Ms. Proefrock spoke with her husband, who came by the apartment, and her mother, brother and

---

2. The handwritten statement reads:
   "I have no knowledge of any missing money from the Albertson's vault or from my drawer. I will do anything in my power to help search for the money, or aid in any way possible."

best friend by telephone. She told them SFB had accused her of taking the money, she did not do it, but no one believed her. All of the people to whom Ms. Proefrock spoke said she seemed upset, but sounded like she was in control and could handle the situation. Within a couple of hours, however, Ms. Proefrock was dead from a self-inflicted gunshot wound.

[¶ 30] This evidence would not lead reasonable minds to conclude SFB's conduct was extreme and outrageous. Upon learning that over $1,000 was missing from the Albertson's branch, SFB conducted an investigation involving the audit of all of the teller drawers and questioning those tellers whose drawers did not balance. Contrary to the assertion of the estate and Mr. Proefrock, Ms. Proefrock was not singled out as the only suspect. The undisputed evidence showed that other branch employees were also considered suspects. On its face, this does not constitute extreme and outrageous conduct.

[¶ 31] The estate and Mr. Proefrock assert, however, genuine issues of material fact existed as to whether SFB's conduct was extreme and outrageous because they presented evidence, gathered after Ms. Proefrock's death, showing SFB knew or should have known she did not take the money and intentionally accused her anyway, knowing the accusation would cause severe emotional distress. They presented detailed and lengthy argument and documentation concerning the intricacies of teller operations at SFB. They asserted it was SFB policy for a teller who was leaving for vacation to balance her drawer at the end of her shift and have her supervisor or a co-employee verify the balance. The balance sheet Ms. Proefrock filled out at the end of her shift on July 12, 2001, is missing the verification. Pursuant to SFB procedures, they argue, the omission should have been caught first by Mr. Wright on July 13 and, if not, then by Susan Beatty the following Monday. Mr. Wright and Ms. Beatty testified they did not catch the omission. The estate an Mr. Proefrock contend Mr. Wright and Ms. Beatty either failed to follow internal control procedures designed to cross-check and verify teller drawer bal-

ances, or they are lying, they did follow correct procedure, Ms. Proefrock's drawer balanced, and they willfully withheld evidence of Ms. Proefrock's innocence and falsely accused her of taking the money when they knew she did not.

[¶ 32] The difficulties with this argument are several. First, there is no evidence SFB knew on the date of Ms. Proefrock's suicide—or indeed knows even now—that she did not take the money. After a lengthy and thorough investigation involving potential suspects, the prosecuting attorney concluded he did not have sufficient evidence to charge anyone with the theft and declined to prosecute. Thus, there is no evidence SFB *falsely* accused Ms. Proefrock. The efforts of the estate and Mr. Proefrock to prove otherwise are purely speculative and require the court to believe Ms. Jackson and Mr. Wright knew Ms. Proefrock's drawer balance was not verified, balanced it themselves, lied about having done so, willfully withheld that information and set Ms. Proefrock up to take the blame for the missing funds. These assertions are unsupported by any evidence and require a leap we are not willing to make.

[¶ 33] Second, there is no evidence supporting the claim Mr. Wright and Ms. Beatty *willfully* withheld information which would have shown Ms. Proefrock's innocence. Their undisputed testimony was they did not catch the missing information on the balance sheet Ms. Proefrock filled out before leaving for vacation. The assertion that they reviewed the form, it was properly filled out and they are hiding evidence is based entirely on accusation and conjecture, which is not sufficient to create a genuine issue of material fact and overcome summary judgment.

[¶ 34] This leaves the estate and Mr. Proefrock with the contention that SFB, and specifically Ms. Beatty and Mr. Wright, failed to follow internal control procedures by checking the teller balance sheet and following up when they discovered the balance had not been verified. Throughout their appellate brief, they refer to "suspicious events," "breaches of policy," "improprieties," and "surprising entries." Such assertions are not sufficient to show that SFB intentionally and recklessly engaged in conduct so extreme

and outrageous as to cause Ms. Proefrock such severe emotional distress that she took her own life. At most, the accusations suggest at the point when Ms. Proefrock committed suicide, SFB had not followed up on all possible avenues for investigating the missing funds. Ms. Proefrock's tragic and almost immediate action in taking her life likely disrupted those efforts and the matter was turned over to the police.

[¶ 35] Giving the estate and Mr. Proefrock all favorable inferences, SFB's actions after discovering the missing money may have been unfinished. By the time of Ms. Proefrock's suicide, SFB personnel may not have performed a complete investigation. Such is not sufficient to show extreme and outrageous conduct. As quoted above, comment "d" of the Restatement section states:

> Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

[¶ 36] Having exhaustively reviewed the record in this case, we are unable to conclude an average member of the community confronted with these facts would find SFB's conduct extreme and outrageous. Ms. Proefrock's drawer was found not to balance while she was away on vacation. She, along with other branch employees, was considered a suspect. She, like Ms. Clucas, was questioned and advised an investigation would be conducted, law enforcement would be involved and polygraphs would likely be given. She, like Ms. Clucas, was placed on paid administrative leave and asked to submit a written statement.

[¶ 37] Ms. Proefrock's almost immediate reaction was to take her own life, an act which those closest to her who talked to her that morning in essence said was totally out of character and unforeseeable. She did so before law enforcement began its investigation and thus before it had the opportunity to discover the evidence the estate and Mr. Proefrock gathered in the months following her death. Giving all favorable inferences to the estate and Mr. Proefrock, the evidence simply does not raise a genuine issue of material fact for trial, and summary judgment was proper.

[¶ 38] The estate and Mr. Proefrock also contend SFB acted outrageously by misrepresenting or failing to disclose facts to Ms. Proefrock, including that SFB had cameras of which employees were not aware; she was the only suspect; and, funds in fact were missing. Although the evidence indicates Ms. Proefrock was the only employee who was told there were hidden cameras, that alone is not sufficient to create a genuine issue of material fact on the issue of outrageousness. The second assertion—that Ms. Jackson failed to disclose that there were other suspects—is likewise insufficient to create a factual question showing outrageousness. The assertion that SFB made a material misrepresentation by telling Ms. Proefrock money was missing is perplexing. From our review of the record, we see no evidence suggesting funds were not missing.

[¶ 39] Comment "g" of the Restatement (Second) of Torts, § 46 states that an actor is never liable where he has done no more than to insist upon his legal rights in a permissible way, even though he is aware it is certain to cause emotional distress. To illustrate, the Restatement describes a landlord who threatens to evict a mother and her children, knowing they are destitute and ill. The Restatement explains: "Although B's conduct is heartless, he has done no more than the law permits him to do, and he is not liable to A for her emotional distress."

[¶ 40] Analogizing this illustration to the present case, we are unable to conclude even that SFB's actions were heartless. No evidence was presented showing SFB did anything more than it was legally entitled to do in questioning Ms. Proefrock about the missing funds. This is not a case like *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 576 A.2d 441 (Vt.1990), where an employee of eighteen years was summarily dismissed after being falsely accused of theft, kept in a three-hour meeting with no opportunity to leave or have lunch, badgered to sign a confession and called a thief in published reports. There simply is no evidence of outrageous conduct.

### 3. Foreseeability of Suicide v. Foreseeability of Harm

[¶ 41] The estate and Mr. Proefrock claim next that they were not required to show Ms. Proefrock's suicide was foreseeable, they were only required to show it was foreseeable SFB's conduct would cause injury to her. In the context of the claim for intentional infliction of emotional distress, the question of foreseeability becomes relevant only upon finding that SFB's actions were extreme and outrageous. Because we hold that no genuine issue of material fact was presented on the issue of outrageousness, we do not address the foreseeability issue in the context of the intentional infliction claim.

### 4. Negligently Caused Suicide

[¶ 42] The estate and Mr. Proefrock assert that Wyoming has recognized a claim for negligently-caused suicide. They cite *R.D.*, 875 P.2d at 28, in which we recognized an exception to the general rule that a decedent's intentional and voluntary suicide is an intervening cause which precludes liability for negligence. That exception, adopted from the Restatement (Second) of Torts, § 455,[3] applies when the tortfeasor's wrongful act causes the decedent to become insane and the decedent's insanity prevents him from realizing the nature of his act or from controlling his conduct. In such cases, the suicide will not be considered as being an intervening cause and the tortfeasor may be held liable for the suicide. The estate and Mr. Proefrock contend the exception applies here—SFB falsely accused Ms. Proefrock of theft which caused her to become insane and unable to realize the nature of her suicidal act or control her behavior.

[¶ 43] SFB responds that the exception recognized in *R.D.* should not be applied here because: 1) to do so would make employers potentially liable for unintended and unforeseeable consequences of employment decisions; 2) the facts surrounding Ms. Proefrock's suicide bear no similarity to the facts in *R.D.*; 3) the expert psychiatrist retained by the estate and Mr. Proefrock testified there was no evidence Ms. Proefrock was insane prior to or at the time she spoke to family members on July 23 and he could only speculate as to whether anything occurred thereafter to change her mental state.

[¶ 44] Again, there are several difficulties with the assertions made by the estate and Mr. Proefrock. First and foremost, in order for liability to attach for a decedent's suicide, there must be a wrongful act. As we said in *R.D.*, 875 P.2d at 28, "when the tort-feasor's *wrongful* act causes the decedent to become insane and the decedent's insanity prevents him from realizing the nature of his act or from controlling his conduct, the suicide will not be considered as being an intervening cause and the tort-feasor may be held liable for the suicide." Reviewing the evidence presented on the claim that SFB negligently caused Ms. Proefrock's suicide, we hold the trial court properly granted summary judgment. The estate and Mr. Proefrock failed to present facts from which a jury could conclude SFB committed a wrongful act that led to the suicide. As was stated in *Jones v. Schabron,* ¶ 23, 113 P.3d at 39–40:

> A person, no doubt, could create many "what if" scenarios that, in hindsight, might have prevented this tragic incident. But, negligence and proximate cause are never presumed from the happening of an accident, and mere conjecture cannot form the basis of liability. Guesswork is not a substitute for evidence or inference, and inference cannot be based on mere possibility. General or conclusory allegations cannot establish a genuine issue of material fact. (Citations omitted).

The record in this case shows only that SFB did what an employer is entitled to do when funds are found to be missing. Despite their

---

**3.** Section 455 provides:

If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

efforts, the estate and Mr. Proefrock failed to establish a genuine issue of material fact showing SFB committed a wrongful act. One must guess, or speculate, or surmise in order to conclude SFB was negligent. The facts presented by the estate and Mr. Proefrock are not facts, but conclusions without any factual basis. They require a leap of faith we are not willing to make. Consequently, the district court's decision granting summary judgment is affirmed.

### 5. Mr. Proefrock's Emotional Distress

[¶ 45] Mr. Proefrock claims he has separate claims for negligent and intentional infliction of emotional distress. We addressed these claims previously in this opinion. A negligent infliction of emotional distress claim requires proof of negligence. We find no genuine issue of material fact showing SFB was negligent. An intentional infliction of emotional distress claim requires proof of extreme and outrageous conduct. No genuine issue of material fact was presented on that element.

### 6. Punitive Damages

[¶ 46] Finally, the estate and Mr. Proefrock claim the facts of this case support a jury finding that the conduct of Mr. Wright and Ms. Jackson was willful and wanton so as to support an award of punitive damages. A claim for punitive damages is an element of a cause of action; it does not constitute a separate claim or cause of action. *Errington v. Zolessi,* 9 P.3d 966, 969 (Wyo. 2000). Summary judgment on the underlying claims effectively disposed of the punitive damages claim and no further discussion is necessary.

[¶ 47] Affirmed.

